IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ASHLEY TAYLOR, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 17 CV 2380 |
| | ) Judge Robert W. Gettleman |
| CATHOLIC CHARITIES OF THE ARCHDIOCESE OF CHICAGO, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ashley Taylor was a case manager for defendant Catholic Charities of the Archdiocese of Chicago. A year and a half into her tenure, she took leave under the Family Leave and Medical Care Act, 29 U.S.C. § 2601 et seq. ("FMLA"). Instead of going back to work, she sued, alleging in her third amended complaint three claims: (1) altered terms and conditions based on race, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2(a) ("Title VII"); (2) a racially-hostile work environment, also in violation of Title VII; and (3) intentional infliction of emotional distress, in violation of state law. Catholic Charities moves for summary judgment. For the following reasons, the motion is granted.

## BACKGROUND

The facts are taken from the parties' depositions, exhibits, and Local Rule 56.1 statements, and are construed in the light most favorable to plaintiff. Plaintiff, an African-American woman, was hired as a case manager in May 2015 for Catholic Charities of the Archdiocese of Chicago, a not-for-profit agency that provides services to the elderly population. As a case manager, plaintiff was required to: provide directed services to elderly clients needing

assessment and Case Management to remain safely and comfortably in the community; thoroughly gather information and facts from multiple sources in Case Management activities; assess, analyze, and develop plans for her clients; and timely and accurately submit paperwork under guidelines promulgated by the Illinois Department on Aging. About half of each case manager's day was spent traveling to and assessing clients; the other half was spent in the office completing paperwork.

Simmons talked to plaintiff in October 2015 about potentially transferring to the Choices for Care program, which involves visiting clients in hospitals rather than in their homes. She thought that plaintiff appeared "overwhelmed" in the in-home setting and believed that the hospital setting would be a better fit for plaintiff—the assessments were quicker and required less attention to detail, with which she thought that plaintiff had been struggling. That same day, plaintiff sent an email to Simmons requesting to transfer and agreeing that it would be "less stressful." Based on that email, Simmons transferred plaintiff to the Choice for Care program.

In November 2015, plaintiff received her six-month probationary review, which was completed by Simmons. Plaintiff was rated numerically in 10 separate categories; her total average was 7.60, the lowest possible score (7.60-8.59) that qualified her for the "Meets Expectations" category. Simmons gave plaintiff a discretionary salary raise of 2%.

In December 2016, plaintiff requested and was granted leave under the FMLA, due to depression and anxiety issues. She never returned, allegedly because her doctor, Donald Sherwood, advised against returning to Catholic Charities. In July 2017, she emailed an official letter of resignation.

## LEGAL STANDARDS

**Summary judgment.** Summary judgment is proper when no material fact is genuinely disputed and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477U.S. 317, 322 (1986). Once the moving party meets its burden, the nonmoving party must go beyond the pleadings and set forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(c); Becker v. Tenenbaum-Hill Associates, Inc., 914 F.2d 107, 110 (7th Cir. 1990). The court considers the evidence as a whole and draws all reasonable inferences in the light most favorable to the nonmoving party. Green v. Carlson, 826 F.2d 647, 651 (7th Cir. 1987). A material fact is genuinely disputed if the evidence would allow a reasonable jury to return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The nonmoving party must, however, "do more than simply show that there is some metaphysical doubt about the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence" supporting the nonmoving party is not enough. Anderson, 477 U.S. at 252.

**Title VII.** Under Title VII, employers cannot discriminate against employees based on "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e–2(a)(1). To defeat summary judgment, an employee claiming race discrimination must show that she is a member of a protected class, that she has been subjected to an adverse employment action, and that the employer took the adverse employment action based on her race. Abrego v. Wilkie, 907 F.3d 1004, 1012 (7th Cir. 2018).

An adverse employment action "must be a significant change in employment status . . . ." Burlington Industries, Inc. v. Ellerth, 524 U.S. 742, 761 (1998). The purpose of this "significant change" requirement is to "distinguish meritorious cases from trivial personnel actions brought

by irritable, chip-on-the-shoulder employees." Lewis v. Chicago, 496 F.3d 645, 653 (7th Cir. 2007) (citation, quotation marks, and alterations omitted). A change in employment status is significant when it affects: the employee's compensation or benefits (current wealth); the employee's job duties (future wealth); or the employee's job conditions, such that those conditions amount to a hostile work environment or constructive discharge. Id., citing Herrnreiter v. Chicago Housing Authority, 315 F.3d 742, 744–45 (7th Cir. 2002).

**Intentional infliction of emotional distress.** In Illinois, intentional infliction of emotional distress is a tort with three elements: (1) the defendant engaged in "truly extreme and outrageous conduct"; (2) the defendant "intend[ed]" to "inflict severe emotional distress" or "kn[ew]" that there was "a high probability" of causing severe emotional distress; and (3) the conduct "in fact" caused severe emotional distress. Schweihs v. Chase Home Finance, LLC, 2016 IL 120041, ¶ 50. "[T]ortious or even criminal" intent is not enough. Id. at ¶ 51. A defendant is liable "only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Id.

## DISCUSSION

For her Title VII claims, plaintiff argues that she suffered a significant change in her employment status because her supervisors' actions, (1) affected her job duties, and (2) created a hostile work environment. And for her intentional infliction of emotional distress claim, plaintiff argues that her supervisors' conduct was so extreme and outrageous as to constitute the tort. No reasonable jury, however, could find that plaintiff suffered a significant change in her employment status on either of her Title VII claims, and no reasonable jury could find that her

4

supervisors' conduct was extreme and outrageous. Catholic Charities is therefore entitled to summary judgment on all three claims.

**1.      Title VII: transfer causing a reduction in long-term career prospects**

Plaintiff does not dispute that during her time with Catholic Charities, she maintained at least the same level of compensation and benefits—in fact, after her six-month probationary period, she received a discretionary salary raise of 2% (the maximum was 4%). She argues, however, that her transfer from the Care Coordination Program (where she would visit program participants in their homes) to the Choices for Care Program (where she would visit participants at the hospital) was a significant change in her job duties.

No reasonable jury could find that plaintiff's transfer to Choices for Care reduced her long-term career prospects. Plaintiff does not dispute that:

- all case managers are trained in both programs;
- both programs require case managers to use their skills and training to assess participants and to advocate for the appropriate services; and
- neither program is considered more prestigious.

Plaintiff's only response is that the transfer forced her to commute from the office to the hospital, which took her an hour. She does not, however, dispute that she maintained the same mileage for travel that she had before, and she offers no evidence that any employee—other than her—considered the Choices for Care program inferior. No evidence in the record would allow a reasonable jury to find that working in the Choices for Care program would "stunt[]" plaintiff's career, thus causing her future financial harm. Herrnreiter, 315 F.3d at 744–45 (holding that an accountant's transfer from investigations to auditing was not an adverse employment action, reasoning that although "[t]he use of a company car and being excused from having to sign in or out of an office might be preferred by some employees," the jobs were "equivalent other than in

5

idiosyncratic terms"). In addition, as noted above, plaintiff requested the transfer to the same Choices for Care program of which she now complains.

**2.      Title VII: severe or pervasive harassment causing a hostile work environment**

To survive summary judgment on a hostile work environment claim based on race, an employee must offer enough evidence for a reasonable jury to find that: (1) she was subject to unwelcome harassment; (2) the harassment was based on race; (3) the harassment was so severe or pervasive as to alter the conditions of employment and create a hostile or abusive work environment; and (4) there is a basis for employer liability. Robinson v. Perales, 894 F.3d 818, 828 (7th Cir. 2018). Harassment that comes not from a co-worker, but from a supervisor, is more likely to be actionable. Gates v. Chicago Board of Education, No. 17-3143, 2019 WL 698000, at *5–6 (7th Cir. 2019). Whether a workplace is hostile depends on "all the circumstances." Harris v. Forklift Systems, Inc., 510 U.S. 17, 22 (1993).

No reasonable jury could find that the alleged harassment here was severe or pervasive. Plaintiff alleges four incidents of "harassment" by her supervisors, none of them severe:

**Supervisor Young sitting next to her at an all-staff meeting.** On May 16, 2016, Catholic Charities held an all-staff meeting on "Active Shooters in the Workplace." There were no assigned seats. While plaintiff was seated, Supervisor Gina Young came in, removed the belongings on the seat next to plaintiff, and sat down next to plaintiff, which plaintiff found uncomfortable. Once Young sat down, plaintiff moved seats. There was no further interaction between them. Plaintiff testified that moving someone's belongings to sit next to her was "very rude," "unprofessional" and "disrespectful."

**Supervisors Simmons and Harris's comments about not smiling.** Several times a week from May 2015 to October 2015, Supervisors Marla Harris and Sherry Simmons would say

6

that plaintiff seemed unhappy and would ask if this was "the right job for [her]." Plaintiff would respond that she liked her job. When they said that plaintiff did not smile, plaintiff would say, "It's just me. That's who I am."

**Supervisor Andress standing over her.** On November 29, 2016, plaintiff was talking with several coworkers about Fidel Castro. According to plaintiff's deposition testimony, a supervisor told one of plaintiff's coworkers, Ashley Daniels, to stop talking about politics. Daniels responded, "[I]f you have a problem with me, you can bring it up to my supervisor." The supervisor left. Supervisor Sherry Simmons came out and screamed, "There's no politics in the workplace." Hearing the commotion, yet another supervisor—Barb Andress—appeared at the end of the aisle. She gave a "sharp" and "evil" stare towards Daniels and plaintiff. Andress said to plaintiff, "[Y]ou heard Sherry. There is no politics in the workplace or else." Plaintiff replied, "Or else what?" Andress then walked over to plaintiff—who was sitting—and stood over plaintiff for about one minute, in what plaintiff described as "an awkward silence." Plaintiff asked Andress to back up three times, saying, "I feel real intimidated." Andress backed up.

**Supervisors Simmons and Harris's refusal to move her cubicle.** After she was hired, plaintiff was assigned to a cubicle in a row that had no coworkers. There were three cubicles to a row; each pair of rows was separated by a partition that was five feet, eight inches tall. To visit her coworkers in the next row, plaintiff was forced to walk around the partition. This took about 15 seconds. According to plaintiff, she repeatedly asked Supervisor Sherry Simmons to move rows, but Simmons refused to do so for a year, saying that she could not move plaintiff to another row without Supervisor Marla Harris's permission.

These four incidents are, at most, "merely offensive," and certainly are not so severe that they create "an abusive working environment." Scruggs v. Garst Seed Co., 587 F.3d 832, 836,

7

840 (7th Cir. 2009); see Alexander v. Casino Queen, Inc., 739 F.3d 972, 982 (7th Cir. 2014) (affirming summary judgment for an employer on a hostile work environment claim based on race when the employer had frequently subjected African-American employees to "unfair suspensions, financially harmful floor reassignments, unjustified write-ups, and unusually close supervision," and "knew about, but failed to remedy, their complaints of race discrimination"). Of plaintiff's allegations, the most serious is that Andress stood next to her for a minute in silence. Doing so might have been strange, even offensive—or, in plaintiff's words, "awkward," even "intimidating"—but could not have been so severe as to alter the conditions of plaintiff's employment. See Scruggs, 587 F.3d at 836 (affirming summary judgment for an employer on a hostile work environment claim based on gender when the employee's supervisor had told her that she was "made for the back seat of a car," was not "smart enough," was a "redneck," and looked like a "dyke").

Arguing that the harassment was pervasive does plaintiff no better. Although "a relentless pattern of lesser harassment that extends over a long period of time" may be enough to create a hostile work environment, Cerros v. Steel Techs., Inc., 288 F.3d 1040, 1047 (7th Cir. 2002), the "harassment" here is hardly harassment at all. Telling plaintiff that she did not smile and that she seemed unhappy—even doing so repeatedly over five months—could not have created "an abusive working environment." Nor could it have been abusive for her supervisors to refuse to move her cubicle to another row—even for an entire year—when she needed to walk only 15 seconds to visit her coworkers. Cf. Gorence v. Eagle Food Centers, Inc., 242 F.3d 759, 763 (7th Cir. 2001) ("[I]t is simply not true, we want to emphasize, that if a litigant presents an overload of irrelevant or nonprobative facts, somehow the irrelevancies will add up to relevant evidence of discriminatory intent. They do not; zero plus zero is zero."). Although these

8

incidents apparently made plaintiff unhappy, perhaps even justifiably so, "not everything that makes an employee unhappy is an actionable adverse action." Smart v. Ball State University, 89 F.3d 437, 441 (7th Cir. 1996). No reasonable jury could find for plaintiff on her Title VII claim.

3. **Intentional infliction of emotional distress**

Plaintiff offers no serious argument for denying summary judgment on her intentional infliction of emotional distress claim. Even assuming that Catholic Charities is vicariously liable for the conduct of plaintiff's supervisors, the nature of their conduct was nowhere close to "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Schweihs, 2016 IL 120041 at ¶ 51. Plaintiff responds that she suffered anxiety attacks and migraines, but does not genuinely dispute that her supervisors knew nothing about that. Nor does she dispute that she never left work after any of these incidents, or that she was given leave under the Family and Medical Leave Act when she asked for it. These facts would not allow a reasonable jury to find that plaintiff's supervisors engaged in "truly extreme and outrageous conduct," or that they intended to inflict severe emotional distress. Schweihs, 2016 IL 120041 at ¶ 50; see, e.g., Khan v. American Airlines, 266 Ill. App. 3d 726, 732–33 (Ill. App. 1994) (affirming the dismissal of an intentional infliction of emotional distress claim in which the plaintiff alleged that an airline's employees falsely arrested him, which prevented him from attending his father's funeral), abrogated on other grounds by Velez v. Avis Rent A Car System, 308 Ill. App. 3d 923 (Ill. App. 1999). Catholic Charities is therefore entitled to summary judgment on the merits, and the court need not address its argument that plaintiff's claim is preempted by the Illinois Human Rights Act, 775 ILCS 5/2-101 et seq.

\* \* \*

Plaintiff also offers a number of facts that the court will not consider because they are inadmissible, conclusory, or omitted from her Local Rule 56.1 statement of additional facts. Those facts are contained in: (1) her complaint; (2) statements from Justin Jones, Elizabeth Marrero, Joyce Fain, and Ashley Daniels, all current or former Catholic Charities employees; (3) a text message from "Crystal"—apparently, another Catholic Charities employee; and (4) a declaration from her psychologist, Donald Sherwood.

First, a complaint is not evidence. The entire point of summary judgment is "to pierce the pleadings and to assess the proof . . . to see whether there is a genuine need for trial." Matsushita, 475 U.S. at 587 (emphasis added; citation and quotation marks omitted). Allegations in a complaint are not proof. They do not save plaintiff from summary judgment.

Second, the statements of Jones and Marrero, the email from Fain, and the text message from Crystal, are all inadmissible because they are neither sworn before someone "authorized to administer an oath," nor made "under penalty of perjury." Pfeil v. Rogers, 757 F.2d 850, 859 (7th Cir. 1985) (quotation marks and citations omitted). Such statements do not qualify as "affidavits" or "declarations" under Fed. R. Civ. P. 56(c)(4).

Third, the statement of Ashley Daniels, although sworn, consists mostly of allegations too vague and conclusory to avoid summary judgment. See Gabrielle M. v. Park Forest-Chicago Heights, Illinois School District 163, 315 F.3d 817, 822 (7th Cir. 2003) (affirming summary judgment for a school district on a sexual harassment claim under Title IX of the Education Amendments of 1972 and reasoning, in part, that "the complained-of conduct alleged . . . is so vague and unspecific that it cannot provide a basis to determine whether that conduct was [actionable]"). The parts of the statement on which plaintiff relies state that Daniels saw plaintiff "being bullied and treated unfair[ly]," that management "ignored the obvious bullying that Ms.

10

Taylor was receiving," and that plaintiff was "constantly harassed." Such conclusory allegations are not enough to defeat summary judgment. See, e.g., id. at 822–23 ("Gabrielle cannot avoid summary judgment by asserting general allegations that Jason 'bothered' her by doing 'nasty stuff.'"). The most specific part of the Daniels statement is that, while watching Andress standing next to plaintiff, Daniels "fel[t] as if the supervisor would initiate physical contact." Even that, however, is vague and speculative, and—if accepted and taken in the light most favorable to plaintiff—shows only that plaintiff was justified in feeling intimidated. A reasonable jury could not, based on Daniels's feelings, find that Andress's conduct was "extreme," which it must have been for a hostile work environment claim, Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998), or "beyond all possible bounds of decency," which it must have been for an intentional infliction of emotional distress claim. Schweihs, 2016 IL 120041 at ¶ 51.

Fourth, the declaration of Dr. Sherwood, which states that he "strongly recommended" that plaintiff "not return to Catholic Charities due to the hostile environment and the [e]ffects it had on her mental and physical health," is conclusory, lacks personal knowledge, and is mostly irrelevant. His allegation that Catholic Charities had a "hostile environment"—an allegation lacking personal knowledge—is a mere conclusion insufficient to create a genuine issue for trial. His allegation that Catholic Charities had "effects" on plaintiff's "mental and physical health"— even if such an allegation were specific enough for summary judgment—is relevant only to half of one element of plaintiff's intentional infliction of emotional distress claim (that Catholic Charities' conduct caused severe emotional distress). That claim, however, does not survive summary judgment for independent reasons: as discussed, no reasonable jury could find that Catholic Charities had engaged in truly extreme and outrageous conduct, or that it knew of a high probability of inflicting severe emotional distress. Those are the other essential elements of

11

plaintiff's intentional infliction of emotional distress claim, and her failure to support those elements is fatal.  Celotex, 477 U.S. at 322–33.

The court will not consider these facts for yet another reason:  by attempting to introduce them as exhibits to her motion opposing summary judgment, rather than in her statement of additional facts, plaintiff violates Local Rule 56.1.  Local Rule 56.1(b)(3)(C) requires the party opposing summary judgment to file "a statement . . . of any additional facts that require the denial of summary judgment, including references to the affidavits, parts of the record, and other supporting materials relied upon."  This rule "provides the only acceptable means of disputing the other party's facts and of presenting additional facts to the district court."  Midwest Imports, Ltd. v. Coval, 71 F.3d 1311, 1317 (7th Cir. 1995) (discussing Local Rule 12(N), now Local Rule 56.1).  Other than Dr. Sherwood's statement, plaintiff chose not to include her facts in her statement of additional facts.  By "cho[osing] not to employ [the] means" provided by Local Rule 56.1, plaintiff "must suffer the consequences, harsh or not of [her] default."  Id.

## CONCLUSION

Defendant Catholic Charities of the Archdiocese of Chicago's motion for summary judgment (Doc. 40) is granted.

**ENTER:** **March 13, 2019**

**Robert W. Gettleman**
**United States District Judge**